Filed 6/21/24

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| JOHN DOE et al.,<br><br>    Plaintiffs and Respondents,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF MOTOR VEHICLES et al.,<br><br>    Defendants and Appellants. | A164843<br><br>(Alameda County<br>Super. Ct. No. RG16805013) |

The rights to privacy set out in our state constitution and various statutes are among our most cherished. But they are not without limit. We consider those limits in the context of the California Department of Motor Vehicles' (DMV) disclosure of alcohol-impaired driving license suspensions and reverse the trial court's decision restricting those disclosures.

The DMV compiles driving records and provides them to prospective or current employers, insurance companies, and a variety of other requesters. License suspensions imposed by DMV, including those related to alcohol-impaired driving, are included in these records, even when no criminal

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.C–D.

1

conviction has resulted. These suspensions remain on the driving record for three years after the suspension itself ends.

We address whether DMV may also include on this publicly disclosed driving record the *reason* for such a suspension—for example, that the driver had an excessive blood-alcohol level—when the driver has not been convicted. The plaintiffs argue this practice effectively discloses information about a nonconviction arrest and, therefore, violates constitutional and statutory privacy prohibitions. We disagree: the disclosure of the reason for a DMV suspension issued for alcohol-impaired driving does not constitute the disclosure of information about a nonconviction arrest within the meaning of these privacy provisions.

FACTUAL AND LEGAL BACKGROUND

A.    *The Public Driver Record*

DMV discloses portions of a person's DMV record to members of the public under certain circumstances. We refer to this as the "public driver record."[1]

1.    *Contents*

The public driver record contains the driver's name; identifying information such as eye color and height; and license number, class, and status. It also includes sections entitled "Departmental Actions," "Convictions," "Failures to Appear," and "Accidents." (Capitalization altered.) License suspensions are shown in the "Departmental Actions" section.[2]

---

[1] DMV produces public driver records in formats referred to as "K4" or "DL 414," which each contain identical information.

[2] For convenience, we use the term "suspensions" to refer to both suspensions and revocations. (Veh. Code, §§ 13102 ["When used in reference to a driver's license, 'suspension' means that the person's privilege to drive a

Driving-related convictions, accidents, and suspensions are not disclosed on the public driver record indefinitely.  Certain convictions are disclosed for ten or seven years from the date of occurrence; for example, a driving under the influence (DUI) conviction is disclosed for ten years. (§ 1808, subd. (b)(1)–(2); see also § 1803, subds. (a)–(b) [identifying convictions required to be reported to DMV].)  All other convictions and all accident reports are disclosed for three years.  (§ 1808, subd. (b)(3).)  All suspensions are disclosed while in effect.  (§ 1808, subd. (c).)  Certain suspensions are not disclosed after the suspension terminates; all others are disclosed for three years after the suspension ends.  (§ 1808, subd. (c).)[3]

For each suspension disclosed, the public driver record includes the date the suspension began and, if no longer in effect, the date it ended.  It also includes the statute authorizing the suspension, for example, "13352," referring to section 13352; and the "Reason" for the suspension, for example, "Excessive blood alcohol level."[4]  (Capitalization altered.)

---

motor vehicle is temporarily withdrawn."], 13101 ["When used in reference to a driver's license, 'revocation' means that the person's privilege to drive a motor vehicle is terminated and a new driver's license may be obtained after the period of revocation."].)  All undesignated section references are to the Vehicle Code.

[3] The suspensions not disclosed after termination are those imposed for failure to pay a child support order (Fam. Code, § 17520; former Welf. & Inst. Code, § 11350.6, repealed by Stats. 1999, ch. 478, § 14, eff. Jan. 1, 2000); by a juvenile hearing officer (Welf. & Inst. Code, § 256); and pursuant to former statutes requiring license suspensions for certain vandalism offenses and for minors who are habitual truants (former § 13202.6, repealed by Stats. 2019, ch. 505, § 13, eff. Jan. 1, 2020; former § 13202.7, repealed by Stats. 2018, ch. 717, § 1, eff. Jan. 1, 2019).

[4] When discussing the "reason" for a suspension, we refer to both the statutory authority and the phrase describing the reason.

2.    *Authorized Recipients*

There are three categories of authorized recipients of public driver records.

First, employers of certain drivers must participate in a program whereby the employer receives public driver records annually and any time a conviction, accident, suspension, or other adverse license action is added. (§ 1808.1, subds. (b)–(c).)  This program is referred to as the "Employer Pull Notice" or "EPN" program.  Drivers covered by this program include tractor-trailer operators, bus drivers, taxi drivers, and drivers for rideshare companies such as Uber and Lyft.  (§ 1808.1, subd. (k); Pub. Util. Code, §§ 5431, subd. (c), 5444.)  These employers are subject to criminal penalties for employing as a driver a person with a suspended license.  (§ 1808.1, subd. (f).)

Second, individuals or organizations with a "legitimate business need" for public driver records may establish an account with DMV to obtain these records.  (§ 1810.2, subds. (a) & (c).)  These account holders are referred to as "commercial requesters."  Examples of legitimate business needs include an insurance company's need to conduct a risk analysis for a driver and an employer's need to determine the driving record of a prospective employee whose job is not covered by the EPN program.

Finally, "casual requesters" are all other individuals or organizations requesting a public driver record.  (§ 1810; see also Cal. Code Regs., tit. 13, § 350.02(c).)  Persons requesting their own public driver record are casual requesters.  All other casual requesters must identify a permissible use before obtaining a public driver record.  Permissible uses include legitimate business uses and uses in connection with a civil, criminal, administrative, or arbitral proceeding.  An example of an impermissible use, which would result

4

in DMV rejecting the record request, is a desire to "get back at" someone who cut off the requester on the freeway.

Persons are not notified when DMV sends their public driver record to an employer as part of the EPN program or to a commercial requester. Persons are notified when DMV sends their public driver record to a casual requestor, but are not notified in advance of the disclosure.

B.    *License Suspensions*

A driver's license can be suspended by a court or by DMV.  (See generally §§ 13100–13559.)  DMV is authorized or required to suspend a license in certain circumstances.  Some of these circumstances relate to driving; for example, accruing a certain number of traffic violation "points" (§§ 12809, subd. (e), 12810.5, 13359); failing to submit to a required reexamination (§ 13801); driving without insurance (§ 16070); or being convicted of certain vehicle-related crimes (e.g., §§ 13350, 13351, 13351.5, 13352).  Others have no relation to driving; for example, failing to pay fines or fees (§ 13364), failing to comply with a court order (§ 13365.5), failing to satisfy a damages judgment (§ 16370), or failing to pay child support (Fam. Code, § 17520, subds. (a)(2), (e)(3)).

The category of DMV suspensions at issue here result from driving with a certain blood-alcohol concentration or refusing to submit to chemical testing.[5]  (§§ 13353, 13353.1, 13353.2.)  A suspension pursuant to these statutes is commonly referred to as an "administrative per se" or "APS" suspension "because it does not impose criminal penalties, but simply

---

[5] The prohibited blood-alcohol concentrations are: (1) 0.08 percent or more; (2) if under 21 years old, 0.01 percent or more; (3) if driving a vehicle that requires a commercial driver's license, 0.04 percent or more; and (4) if on probation for a DUI, 0.01 percent or more.  (§ 13353.2, subd. (a).)

5

suspends a person's driver's license as an administrative matter upon a showing the person was arrested for driving with a certain blood-alcohol concentration, without additional evidence of impairment."[6] (*MacDonald v. Gutierrez* (2004) 32 Cal.4th 150, 155.)

The APS suspension process begins after a peace officer makes a DUI arrest[7] and submits to DMV "a sworn report" (§ 13380, subd. (a)), using a form created by DMV for this purpose called the DS-367. The officer's report includes "a statement of the officer's grounds for belief that the person violated" the relevant statute, as well as the results of any chemical testing or documentation of the person's refusal to submit to testing. (§ 13380, subd. (a).) At the time of the arrest, the officer must serve the person with notice of an order of suspension effective 30 days from service. (§§ 13382, subds. (a)–(b), 13388, subd. (b), 13389, subd. (b).)

When DMV receives the officer's sworn report, it conducts an administrative review of the suspension, which must be concluded before the suspension's effective date. (§§ 13553, subd. (d), 13553.1, subd. (d), 13553.2, subd. (d), 13557, subds. (a) & (c).) DMV reviews the officer's report and any evidence accompanying the report and determines whether, by a preponderance of the evidence, the record establishes that the officer had reasonable cause to believe the violation occurred; the person was arrested; and either the person was driving with a prohibited blood-alcohol level or refused to submit to a chemical test and was told refusal would result in a

---

[6] We also use "administrative per se" or "APS" to refer to suspensions arising from a person's refusal to test.

[7] For convenience, we use the term "arrest" to include detentions pursuant to section 23136, prohibiting blood-alcohol concentrations of 0.01 percent or more in persons under 21 years old.

suspension.  (§ 13557, subds. (a), (b)(1) & (3).)  If DMV finds any required fact not proven by a preponderance of the evidence, it must rescind the order of suspension.  (§ 13557, subd. (b)(2) & (4).)  If DMV finds the required facts proven, it sustains the suspension.  (§ 13557, subd. (b)(1) & (2).)  Suspensions range from four months to three years, depending on the underlying violation and any prior DUI convictions or APS suspensions.  (§§ 13353, subd. (a), 13353.1, subd. (a), 13353.3, subd. (b).)[8]

In addition to or instead of this administrative review, the person may request an administrative hearing on the same facts at issue in the administrative review.[9]  (§ 13358, subds. (a) & (c).)  If the request is made within 10 days of receiving the order of suspension, the hearing must be held before the suspension's effective date.  (§ 13558, subd. (d).)  "The administrative hearing is held before either the director of the DMV, a hearing board or, more usually, a department hearing officer (§ 14104.2, subd. (a))."  (*Lake v. Reed* (1997) 16 Cal.4th 448, 456 (*Lake*).)  The driver may subpoena witnesses and documents, and present evidence.  (§§ 13558, subds. (a) & (b), 14104.5, 14104.7.)  If DMV sustains the suspension,[10] the driver may seek writ review (§ 13559, subd. (a)) and have the "trial court . . . determine, based on its independent judgment, ' "whether the weight of the evidence supported the administrative decision." ' "  (*Lake,* at p. 456.)

---

[8] Suspensions may be longer for commercial driver's licenses.  (See § 13353, subd. (b).)

[9] If the person requests a hearing before completion of the administrative review, the administrative review is not required.  (§ 13557, subd. (e).)

[10] A DMV witness testified in 2020 that in "most recent years," APS suspensions were administratively vacated in approximately 10 percent of APS actions.

7

Determinations made in the administrative proceeding have no collateral estoppel effect in criminal proceedings arising from the same incident.[11] (§§ 13353.2, subd. (e), 13357, subd. (f), 13358, subd. (g), 13559, subd. (b).) Criminal proceedings, however, can impact an APS suspension in certain circumstances. "If a person is acquitted of criminal charges relating to a determination of facts" regarding their blood-alcohol level and whether they were driving, any APS suspension in effect shall "immediately" terminate. (§ 13353.2, subds. (a), (e).) When DMV receives notice of an acquittal it sets aside and nullifies the suspension. In addition, if DUI charges are not filed because of a lack of evidence, or are filed and dismissed because of insufficient evidence, the person has "a renewed right to request an administrative hearing." (§ 13353.2, subd. (e).)

The disclosure of the reason for an APS suspension on a public driver record, even when there is no corresponding conviction, is frequently disqualifying for a job involving driving. Witnesses testified to being denied jobs as an Uber driver and as a receptionist whose job duties included driving herself between job sites, based on APS suspensions for which there was no corresponding conviction. A manager for a trucking company testified an APS suspension within the past five years was disqualifying, even if there were no corresponding conviction, and an insurance broker for transportation industry businesses testified an APS suspension within the last two to three years is generally an unacceptable risk to insurance underwriters. The trucking company manager and insurance broker also testified that, if they

---

[11] A DMV witness testified that in 2014 and 2015, approximately 80 percent of APS suspensions had a corresponding DUI conviction, and an additional 10 percent had a corresponding conviction for alcohol-related reckless driving (§§ 23103 & 23103.5).

learned a prospective employee had a prior suspension but the reason was not identified, they would assume the suspension was for alcohol-related driving.

## PROCEDURAL BACKGROUND

In 2016, a taxpayer plaintiff and several plaintiffs proceeding under pseudonyms (collectively, Plaintiffs) sued DMV and its director. As relevant here, Plaintiffs alleged DMV's disclosure of the reason for an APS suspension for which there was no corresponding conviction violated the California Constitution's right to privacy (Cal. Const., art. I, § 1) and Labor Code section 432.7, subdivision (g)(2) (hereafter Lab. Code, § 432.7(g)(2)). Plaintiffs also alleged DMV violated the Information Practices Act of 1977 (Civ. Code, §§ 1798–1798.78; hereafter Information Practices Act or IPA), by its determination that criminal history and licensing actions are not governed by the IPA's record correction provisions.

A bifurcated bench trial was held, reserving a balancing test relevant to the constitutional privacy claim for phase two. The court issued written decisions after each phase. The court found DMV's disclosure of the reason for an APS suspension for which there was no corresponding conviction violated the constitutional right to privacy of noncommercial drivers, but not of commercial drivers, and violated Labor Code section 432.7(g)(2). The court also found DMV violated the Information Practices Act. The court issued a judgment enjoining DMV from the improper practices.

## DISCUSSION

I.    *Disclosure of the Reason for an APS Suspension*

The parties dispute whether disclosure on the public driver record of the reason for an APS suspension for which there is no corresponding conviction is prohibited by Labor Code section 432.7(g)(2) and/or the

9

California Constitution's right to privacy.[12] Labor Code section 432.7(g)(2) prohibits a person "authorized by law to receive criminal . . . record information maintained by a local law enforcement criminal . . . agency" from disclosing "any information received pertaining to an arrest or detention . . . that did not result in a conviction . . . to any person not authorized by law to receive that information." As relevant here, the California Constitution's "right of privacy applies to the official retention and dissemination of arrest records containing nonconviction data." (*Central Valley Chap. 7th Step Foundation v. Younger* (1979) 95 Cal.App.3d 212, 236 (*Central Valley I*); accord, *Central Valley Ch. 7th Step Foundation, Inc. v. Younger* (1989) 214 Cal.App.3d 145, 162 (*Central Valley II*).)[13] Plaintiffs assume the scope of the statutory and constitutional prohibitions are the same in relevant respects; we do so as well.

It is undisputed that a public driver record revealing an APS suspension does not, on its face, disclose that the licensee was arrested. Instead, it discloses that the suspension was for "Excessive Blood Alcohol Level" or "Refused Chemical Test," and identifies the Vehicle Code section authorizing the suspension on that ground. Plaintiffs argue that this

---

[12] We note that as to some portion of APS suspensions with no corresponding conviction, the criminal process is still pending. Evidence at trial was that criminal DUI proceedings can take two or more years. The parties have not expressly addressed whether the statutory and/or constitutional privacy analysis for these APS suspensions is different than for APS suspensions as to which criminal charges have been dismissed or have not been filed, and we therefore assume it is the same.

[13] While some cases discussing the constitutional provision characterize the prohibited disclosure as "arrest records" (*Central Valley I, supra,* 95 Cal.App.3d at p. 236), others refer more broadly to "information regarding arrests" (*Central Valley II, supra,* 214 Cal.App.3d at p. 165). We assume, without deciding, that the broader characterization controls.

nonetheless constitutes a disclosure of information pertaining to or concerning an arrest because: the APS suspension process begins with an arrest; DMV obtains information about the arrest from the arresting officer; a necessary requirement for an APS suspension is that the person was arrested or detained;[14] and, as the trial court found, a public driver record recipient can determine that an arrest occurred by looking up the cited Vehicle Code section. While, as Plaintiffs' argument shows, an arrest is an integral part of the process leading to an APS suspension, we do not agree that this means DMV is disclosing "information . . . pertaining to an arrest."

Instead, revealing the reason for an APS suspension discloses *the result of an independent administrative adjudication*.[15] The materiality of this distinction is illuminated by the multiple, significant steps in between the arrest and the administrative adjudication. Following the arrest, the arresting officer completes a sworn report for DMV. This report is on DMV's form, the DS-367, and is separate from any internal law enforcement arrest report arising from the same arrest. When received by DMV, the DS-367 commences the administrative APS suspension process. If no hearing is requested by the licensee, DMV conducts an internal administrative review

---

[14] (§ 13557, subd. (b)(1)(B) & (3)(B) [before DMV can impose an APS suspension, it must find, by a preponderance of the evidence, that "[t]he person was placed under arrest or, if the alleged violation was of Section 23136 [the zero tolerance law], that the person was lawfully detained"].) Neither party contends the constitutional privacy or Labor Code 432.7(g)(2) analyses are different for detentions, and we therefore assume there is no material difference.

[15] We note that the conduct considered critical by the trucking company manager and insurance broker who testified below was DMV's administrative determination to suspend a license for driving with a prohibited blood-alcohol level or refusing to test, not that the person had been arrested on suspicion of doing so.

to determine whether the record establishes the requisite elements, including that the person was driving with a prohibited blood-alcohol level or refused to submit to a chemical test. (§ 13557, subds. (a), (b)(1) & (3).) If requested by the licensee, DMV holds an evidentiary hearing and considers witness testimony, documentary evidence, and argument on the same elements. Following the internal review or evidentiary hearing, DMV makes a final determination of whether the requirements for an APS suspension were established. If writ review of the resulting determination is sought, DMV's findings are reviewed by a court. Thus, while the arrest itself and information about it received from the arresting officer are part of this administrative adjudication, the result of the adjudication is not simply information pertaining to or concerning the arrest. (See *Cranston v. City of Richmond* (1985) 40 Cal.3d 755, 773 (maj. opn. of Grodin, J.) [although the appellant was terminated after purportedly being detained, "his discharge was not based on any 'record' of detention within the meaning of Labor Code section 432.7[, subd. (a), prohibiting consideration of nonconviction arrest or detention in decision to terminate employment]. Rather, appellant's discharge was based on [his employer's] independent investigation of the facts surrounding the April 4 incident. The fact that this incident happened to involve a 'detention' (if such it was) by police officers does not bring [his employer's] subsequent decision to terminate appellant within the proscription of Labor Code section 432.7."].)

Similarly, the reason for an APS suspension also does not constitute "offender record information maintained by a local law enforcement criminal . . . agency . . . pertaining to an arrest" that the DMV has "*received*." (Lab. Code, § 432.7(g)(2), italics added.) Assuming, without deciding, that the DS-367 forms submitted to the DMV contain such information, the DMV does not

disclose that information when it discloses the alcohol-related reasons for an APS suspension, because the suspension is the result of an independent administrative adjudication.[16]

These conclusions are supported by the reasons underlying the statutory and constitutional privacy provisions. As Plaintiffs recognize, privacy protections prevent employers and others from using nonconviction arrests because they are unreliable indicators of wrongdoing. "The intent of Labor Code section 432.7 'is to prevent the adverse impact on employment opportunities of information concerning arrests where culpability cannot be proved.' " (*Housing Authority v. Van de Kamp* (1990) 223 Cal.App.3d 109, 115.) Similarly, one of "the principal 'mischiefs' at which the [constitutional privacy] amendment is directed" is "the improper use of information properly obtained for a specific purpose" (*Central Valley II, supra,* 214 Cal.App.3d at p. 161), and the right to privacy therefore protects against "improper uses of [a nonconviction arrest] record," including "reliance on such records as a basis for denying the former arrestee business or professional licensing, employment, or similar opportunities for personal advancement." (*Loder v.*

---

[16] Even if DMV's reliance on the information in the DS-367 form during the administrative adjudication process was material to the privacy issue, it is not the case that DMV so relies in every APS suspension. Additional evidence may be adduced at the administrative hearing to support the suspension (see §§ 13558, subds. (a) & (b); 14104.5; 14104.7), and there is no easy way for the recipient of the DMV's disclosure to determine whether the DMV did, in fact, rely on the information in the DS-367 form. Moreover, whenever a person fails to request a hearing to challenge the suspension, that person has forfeited any challenge to the information in the form. As a result, the person has implicitly conceded that the information is accurate. (See *Ross v. Superior Court* (2022) 77 Cal.App.5th 667, 681 [failure to respond may be construed as an implicit concession].) In that circumstance, the DMV is relying on that implicit concession, rather than on the DS-367.

13

*Municipal Court* (1976) 17 Cal.3d 859, 868; see also *Central Valley II,* at p. 163 ["it is not obvious why nonexempt agencies and licensing entities require information that apparently does not pertain to a criminal conviction"].)

The APS suspension process provides substantially more reliable results. The lawfulness of an arrest depends solely on "whether a *reasonable officer* in the same position would *objectively* conclude there was probable cause to arrest." (*Espinoza v. Shiomoto* (2017) 10 Cal.App.5th 85, 103.) Even where probable cause is present, the facts supporting probable cause have not been subject to challenge before the arrest. While an arrest record exists even when the arrest was unlawful, "for the DMV to suspend the driver's license [under the APS suspension statutes], the underlying arrest must have been lawful." (*Gikas v. Zolin* (1993) 6 Cal.4th 841, 847 (*Gikas*).) Moreover, the DMV must find more than just a lawful arrest to impose a suspension: it must also find the person either was driving with a prohibited blood-alcohol level or refused to test and was told a refusal would result in a suspension. (§ 13557, subd. (b)(1) & (3).) For these findings, "[t]he standard of review is preponderance of the evidence [citation], and the department [DMV] bears the burden of proof." (*Lake, supra,* 16 Cal.4th at p. 455.) Preponderance of the evidence is a higher standard than probable cause. (*People v. Carrington* (2009) 47 Cal.4th 145, 163 ["The showing required in order to establish probable cause is less than a preponderance of the evidence or even a prima facie case."].)

Significantly, while an arrestee has no opportunity to challenge an arrest before it happens, a licensee can challenge an APS accusation before the suspension takes effect. " ' "A driver's license cannot be suspended without due process of law." ' " (*California DUI Lawyers Assn. v. Department*

*of Motor Vehicles* (2022) 77 Cal.App.5th 517, 529 (*DUI Lawyers*); see also

*Knudsen v. Department of Motor Vehicles* (2024) 101 Cal.App.5th 186, 198

["once a driver's license is issued, the driver has a property right in the

license, and the license cannot be revoked or suspended unless certain

constitutional due process protections are followed"].)  The licensee has the

right to retain counsel (§ 14112; Gov. Code, § 11509), to obtain prehearing

discovery (Gov. Code, § 11507.6), to subpoena records and witnesses

(§ 14104.5), and to introduce and rebut evidence (§§ 13558, subd. (b), 14104.7;

Gov. Code, § 11513, subd. (b)).[17]  DMV's determination following an

evidentiary hearing is made by a neutral decisionmaker.[18]  The licensee is

entitled to judicial review of an adverse administrative decision.  (§ 13559.)

To be sure, as Plaintiffs argue, procedures at an APS suspension

hearing are not as rigorous as those in a criminal proceeding.  (E.g., *Lake,*

*supra,* 16 Cal.4th at p. 462 ["One aspect of this accelerated procedure is a

slight relaxation of the rules of evidence applicable to an administrative per

se review hearing."].)  Nonetheless, the Legislature intentionally crafted the

APS suspension statutes to minimize the possibility of error: One of the

express legislative purposes was "[t]o guard against the potential for any

erroneous deprivation of the driving privilege by providing an opportunity for

---

[17] Among the issues a person can raise at an APS suspension hearing is the reliability of any chemical test results, which Plaintiffs' expert on blood-alcohol testing testified was inaccurate between 5 and 10 percent of the time.

[18] In *DUI Lawyers, supra,* 77 Cal.App.5th 517, the Court of Appeal held DMV's then-current practice whereby "the APS hearing officers[] [held] dual roles of advocate and trier of fact" violated due process because "[t]he irreconcilable conflict between advocating for the agency on one hand, and being an impartial decisionmaker on the other, presents a ' "particular combination of circumstances creating an unacceptable risk of bias." ' " (*Id.* at pp. 530, 532.)

15

administrative review prior to the effective date of the suspension and an opportunity for a full hearing as quickly as possible after the suspension becomes effective."[19]  (Stats. 1989, ch. 1460, § 1; see also *Robertson v. Department of Motor Vehicles* (1992) 7 Cal.App.4th 938, 941 ["key provisions in . . . the administrative per se laws[] are aimed at safeguarding the driver's rights of due process"].)  Our Supreme Court has found the "procedural protections" in place for APS suspension proceedings render "the threat of an erroneous administrative determination *minimal*."  (*Lake,* at p. 463, italics added.)

Indeed, the Legislature created the APS suspension process as a separate administrative proceeding, largely independent of any criminal proceedings arising from the same arrest.  " 'The Legislature, in enacting these [APS suspension] statutes, contemplated two processes—one involving court proceedings and criminal in nature, the other involving administrative proceedings and civil in nature; and that these processes are, for the most part, intended to operate independently of each other and to provide for different dispositions.' "  (*Gikas, supra,* 6 Cal.4th at p. 847; see *id.* at pp. 844–845 [criminal proceeding determination that arrest was illegal does not

---

[19] The procedural protections were balanced against the Legislature's desire for an expedited suspension process: "The legislative history [of the APS suspension statutes] reveals that '[t]he need for the administrative per se statutes arose from the fact that "[t]he legal process leading to imposition of a suspension sometimes [took] years from the time of arrest."  [Citation.] "Many drivers with high chemical test results fail[ed] to have sanctions taken against their driving privilege because of reduction in charges as the result of 'plea-bargaining' or pre-trial diversion programs."  [Citation.]  In enacting the administrative per se law, the Legislature intended to establish "an expedited driver's license suspension system" [citation] that would "reduce court delays.  The suspension will be swift and certain and will be more effective as a deterrent...." ' "  (*Gikas, supra,* 6 Cal.4th at p. 847.)

preclude opposite finding by DMV in APS suspension proceeding].)  Notably, the Legislature determined APS suspensions were sufficiently reliable that they should only be vacated by a criminal court acquittal, and not by other nonconviction dispositions in a criminal proceeding.  (*Id.* at p. 856 ["[T]he Legislature used precise language.  It chose to prevent the DMV from suspending a driver's license if the criminal courts found the person in fact not guilty of drunk driving, but not otherwise."]; see also *Agresti v. Department of Motor Vehicles* (1992) 5 Cal.App.4th 599, 604 ["A criminal case may be dismissed on any one of several grounds, some based on procedural defects, others based on the merits of the case. . . . Thus, a dismissal does not necessarily involve a consideration of the merits of the cause."].)

Thus, the low threshold required for an arrest and the absence of any prearrest adversarial testing renders nonconviction arrests unreliable indicators of wrongdoing, and therefore in need of privacy protection to prevent their improper use.  In contrast, an arrest does not lead to an APS suspension unless and until the offense is established under a higher standard and, upon the licensee's request, the accusation is tested in an adversarial evidentiary hearing.  The Legislature considered this procedure sufficiently reliable to decouple the administrative process from the criminal, allowing the administrative result to stand unless the criminal proceeding results in an acquittal.  This decoupling supports a conclusion that prohibiting disclosure of the reason for an APS suspension would not serve the purposes underlying the constitutional and statutory privacy provisions.[20]

---

[20] Additional support is provided by the evidence that at least some employers and insurers would, if a public driver record did not disclose reasons for suspensions, treat all suspensions as alcohol-related.  (See *ante*, pp. 8–9.)  Such an outcome could benefit more dangerous drivers at the expense of those less dangerous.

In sum, we hold that DMV's disclosure of the reason for an APS suspension does not constitute disclosure of information received from law enforcement pertaining to or concerning an arrest, and is therefore not prohibited by Labor Code section 432.7(g)(2) or the constitutional right to privacy.[21]

II.    *Information Practices Act*

DMV argues that the Information Practices Act's record correction provisions do not apply to records of a driver's criminal history and licensing actions.  We disagree.

A.    *Additional Background*

" 'The Information Practices Act, enacted in 1977, generally imposes limitations on the right of governmental agencies to disclose personal information about an individual.  [Citations.]  "The statute was designed by the Legislature to prevent misuse of the increasing amount of information about citizens which government agencies amass in the course of their multifarious activities, the disclosure of which could be embarrassing or otherwise prejudicial to individuals or organizations." ' " (*Bates v. Franchise Tax Bd.* (2004) 124 Cal.App.4th 367, 373 (*Bates*).)

_____

[21] Plaintiffs have asserted no other basis for finding the disclosure prohibited.  We need not and do not decide whether, as DMV contends, DMV is required to disclose the reason for suspensions under section 1808, subdivision (c); and we also need not decide how any such requirement would impact the constitutional privacy and Labor Code section 432.7(g)(2) analyses.  (See § 1808, subd. (c) [DMV "shall make available or disclose suspensions and revocations of the driving privilege"].)  In an amicus brief, a rideshare company sought clarification about the trial court's distinction between commercial and noncommercial drivers.  Because we are reversing the trial court's ruling on the privacy claims, the request for clarification is moot.

The IPA includes provisions authorizing corrections. Civil Code section 1798.35 provides, "Each agency shall permit an individual to request in writing an amendment of a record and, shall within 30 days of the date of receipt of such request," either "Make each correction in accordance with the individual's request" or "Inform the individual of its refusal to amend the record in accordance with such individual's request, the reason for the refusal, [and] the procedures established by the agency for the individual to request a review" by the agency.[22] Civil Code section 1798.36 requires agencies to provide for such review and establishes timelines and certain procedures.[23]

---

[22] In its entirety, Civil Code section 1798.35 provides, "Each agency shall permit an individual to request in writing an amendment of a record and, shall within 30 days of the date of receipt of such request: [¶] (a) Make each correction in accordance with the individual's request of any portion of a record which the individual believes is not accurate, relevant, timely, or complete and inform the individual of the corrections made in accordance with their request; or [¶] (b) Inform the individual of its refusal to amend the record in accordance with such individual's request, the reason for the refusal, the procedures established by the agency for the individual to request a review by the head of the agency or an official specifically designated by the head of the agency of the refusal to amend, and the name, title, and business address of the reviewing official."

[23] In its entirety, Civil Code section 1798.36 provides, "Each agency shall permit any individual who disagrees with the refusal of the agency to amend a record to request a review of such refusal by the head of the agency or an official specifically designated by the head of such agency, and, not later than 30 days from the date on which the individual requests such review, complete such review and make a final determination unless, for good cause shown, the head of the agency extends such review period by 30 days. If, after such review, the reviewing official refuses to amend the record in accordance with the request, the agency shall permit the individual to file with the agency a statement of reasonable length setting forth the reasons for the individual's disagreement."

DMV has established procedures for persons to exercise their rights under the IPA. But DMV does not permit persons to use its IPA correction procedures with respect to criminal history or licensing action information.[24]

B.    *"Records"*

DMV argues that because criminal history and licensing actions are not "personal information" within the meaning of the IPA, the IPA's correction provisions do not apply to this type of information. We disagree.

Certain provisions of the IPA govern agencies' handling of "personal information," defined for purposes of the IPA as information "that identifies or describes an individual . . . ." (Civ. Code, § 1798.3, subd. (a).) However, the correction provisions at issue here (Civ. Code, §§ 1798.35, 1798.36) do not refer to personal information, and instead govern requests to correct "any portion of a record" (Civ. Code, § 1798.35, subd. (a); see also Civ. Code, § 1798.18 ["Each agency shall maintain all records, to the maximum extent possible, with accuracy, relevance, timeliness, and completeness."].) "The term 'record' means any file or grouping of information about an individual that is maintained by an agency by reference to an identifying particular such as the individual's name, photograph, finger or voice print, or a number or symbol assigned to the individual." (Civ. Code, § 1798.3, subd. (g).) This definition of record is not tethered to the definition of personal information, nor are the IPA's correction provisions restricted to those portions of records containing personal information. "The IPA expressly makes the administrative procedures for access, amendment, and correction of information applicable to 'records' maintained by state agencies. The

_____

[24] DMV asserts it has alternative methods to correct such information, but does not contend these methods comply with the IPA.

20

definition of 'records' does not depend on the dichotomy between personal and nonpersonal information." (*Bates, supra,* 124 Cal.App.4th at pp. 378–379.)

DMV argues that, despite the plain language of the correction provisions, these provisions must in fact refer to personal information because the IPA only confers the right to inspect with respect to personal information. However, the statute relied on by DMV underscores the Legislature's understanding that personal information and records are not equivalent: it requires agencies to allow persons to "inspect all the personal information *in any record containing personal information . . . .*" (Civ. Code, § 1798.34, subd. (a), italics added.) Moreover, the Legislature could reasonably determine that inspection rights should be limited to personal information, but that if a person learns of an error in a nonpersonal part of a record, that person should be entitled to request the error be corrected.

DMV does not dispute that information maintained by DMV about a person's criminal history and licensing actions is part of that person's "record" within the meaning of the IPA. We conclude the IPA's correction provisions apply to this information.[25]

C.      *The Federal Driver Privacy Protection Act*

DMV contends Plaintiffs' construction of the IPA would "conflict[]" with the federal Driver Privacy Protection Act (DPPA), 18 U.S.C. §§ 2721–2725, because the federal statute expressly excludes "information on vehicular accidents, driving violations, and driver's status" from its definition of "personal information." (18 U.S.C. § 2725, subd. (3).) As discussed above, the relevant provisions of the IPA refer to "records" rather than "personal information." In any event, DMV does not argue the IPA is preempted by the

_____

[25] We therefore need not decide whether criminal history and licensing actions also constitute "personal information," as Plaintiffs contend.

21

DPPA, nor does it argue the Legislature intended the IPA cover the same information as the DPPA.  Its sole argument, with no authority or further analysis, is that "[i]t makes no sense for the same driver record information to be excluded from 'personal information' under federal law, but not under state law."  "When an appellant asserts a point but fails to support it with reasoned argument and citations to authority, we treat the point as forfeited."  (*Tellez v. Rich Voss Trucking, Inc.* (2015) 240 Cal.App.4th 1052, 1066.)  We need not and do not address this contention.

D.  *Availability of Taxpayer Claim for Declaratory Judgment*

Finally, DMV challenges the availability of a taxpayer claim and declaratory judgment relief.  The challenge fails.

"Code of Civil Procedure section 526a permits a taxpayer to bring an action to restrain or prevent an illegal expenditure of public money. . . .  [T]axpayer suits provide a general citizen remedy for controlling illegal governmental activity."  (*Connerly v. State Personnel Bd.* (2001) 92 Cal.App.4th 16, 29 (*Connerly*).)  "The statute authorizing declaratory judgments is explicitly limited to 'cases of actual controversy.'  (Code Civ. Proc., § 1060.)"  (*Fiske v. Gillespie* (1988) 200 Cal.App.3d 1243, 1246 (*Fiske*).)

DMV argues no actual controversy exists because there is no evidence of incorrect criminal history or licensing action information, and no evidence anyone requested a record correction.  To the contrary, there is an actual controversy: whether DMV's position that the IPA's correction provisions do not apply to criminal history and licensing actions violates the IPA.

DMV next contends the availability of alternative procedures to correct criminal history or licensing actions and judicial review of DMV's decisions in such procedures precludes a taxpayer claim.  We agree with Plaintiffs that this argument reflects a misconception of Plaintiffs' claim.  Plaintiffs are

challenging DMV's *policy* of excluding criminal history and licensing action information from its IPA correction procedures. The availability of alternative procedures to correct an individual's personal record does not preclude Plaintiffs' taxpayer claim. *Nathan H. Schur, Inc. v. City of Santa Monica* (1956) 47 Cal.2d 11, relied on by DMV, is not to the contrary. (See *id.* at p. 17 [where city "hold[s] a public hearing and mak[es] a quasi-judicial determination with reference to the issuance of a license to engage in a certain business . . . and such determination is reviewable by mandamus or certiorari," taxpayer action challenging determination is not available].)

Finally, DMV argues that because a challenge to an IPA violation must show "an adverse effect" (Civ. Code, § 1798.45, subd. (c)), Plaintiffs must also show an adverse effect in their taxpayer claim. We disagree. "No showing of special damage to a particular taxpayer is required as a requisite for bringing a taxpayer suit." (*Connerly, supra,* 92 Cal.App.4th at p. 29.) DMV's authority is easily distinguishable. For example, in *Reno v. Baird* (1998) 18 Cal.4th 640, relied on by DMV, the Supreme Court held that a claim that an employment discharge was in violation of public policy, where the only public policy relied on was a statute prohibiting discriminatory employment discharges, was restricted by the parameters of the statute. (*Id.* at pp. 663–664.)

## DISPOSITION

The portion of the judgment finding in favor of Plaintiffs on their claims for violation of the right to privacy under the California Constitution and violation of Labor Code section 432.7(g)(2), and issuing injunctions based on these claims, is reversed. The judgment is otherwise affirmed. The parties shall bear their own costs.

                                                    SIMONS, Acting P.J.


We concur.


BURNS, J.
CHOU, J.


(A164843)

**Doe, et al.California Department of Motor Vehicles, et al. (A164843)**

Trial Judge:       Hon. Brad Seligman

Trial Court:       Alameda County Superior Court

Attorneys:

      Rob Bonta, Attorney General, Chris A. Knudsen, Senior Assistant Attorney General, Fiel D. Tigno, Supervising Deputy Attorney General, Christopher D. Beatty, Vincent Cheng, and Joshua C. Irwin, Deputy Attorneys General, for Defendants and Appellants.

      East Bay Community Law Center, Miguel Soto, Jr.; Sidley Austin LLP, David R. Carpenter, Nicole M. Baade, Jaime A. Bartlett, Sara B. Brody, and Matthew Henry for Plaintiffs and Respondents.

      Lehotsky Keller Cohn LLP, Steven P. Lehotsky and Gabriela Gonzalez-Araiza for Lyft, Inc. as Amicus Curiae.